# EXHIBIT A

# EVENT LICENSE AGREEMENT

The following terms (the "Basic Agreement") together with the Terms and Conditions attached hereto as Exhibit A (the "Terms and Conditions") constitute the entire agreement (collectively, this "Agreement"), and is entered into as of April 28, 2026 (the "Execution Date"), between Red Bull Arena, Inc., a Delaware corporation ("RBA"), and Licensee identified below ("Licensee") with respect to each Event on the Event Date, as both defined below, at the sports and entertainment venue known as Sports Illustrated Stadium (the "Stadium") located on that certain real property located at 600 Cape May Street, Harrison, New Jersey 07029, and including the parking lots and plaza areas adjacent to the Stadium (collectively, the "Property"). All references to the Property in this Agreement shall include the Stadium. RBA and Licensee are referred to in this Agreement individually as a "Party" and collectively as the "Parties." For avoidance of doubt, references in this Agreement to the Event or references to one of the Events shall be construed to apply to each Event that takes place during the Term.

## Basic Agreement

| | |
|---|---|
| **Licensee** | NVRDUL Events, LLC ("Licensee") |
| **Licensee's Notice Address** | NVRDUL Events, LLC<br>1607 17th Ave S<br>Nashville, TN 37212 |
| **Event** | A series of live music concert as part of the "Sports Illustrated Stadium Concert Series" as set forth herein (the "Performing Acts"). Each such Performing Act concert, an "Event" and collectively, the "Events". |
| **Event Date and Start Time** | Each Event shall start on the date and times as set forth in Schedule 4. |
| **License Fee; Equipment Rental; Screen Upgrades** | Licensees' use of the Stadium during each of the License Periods shall be $0.00.<br><br>RBA agrees to pay Licensee an amount equal to $500,000.00 within 15 days following execution of this Agreement, in accordance with the terms set forth herein, for the right to use the Permanent Equipment during the Term for Stadium programming on seven non-Event days. Licensee shall receive a one-time payment of $70,000 for each additional non-Event day that RBA uses the Permanent Equipment.<br><br>RBA agrees to pay Licensee an amount equal to $335,910.00 within 15 days following execution of this Agreement to be applied towards video and audiovisual technology upgrades that will be using during the Term and during each Event.<br><br>Payment of the foregoing amounts is subject to Licensee complying with all reasonable payment instructions provided by RBA, including registration in RBA's payment system – Taulia. Licensee has been registered in the Taulia system, subject to verification of information provided and is required to submit invoices in the system accordingly for any payment to be processed. |
| **License Period** | The term of this Agreement shall begin on upon execution of this Agreement and shall expire upon the conclusion of the Sixth License Period as set forth on Schedule A (the "Term") or July 16, 2026, unless an earlier date is mutually agreed by the parties.<br><br>Each Event License Period shall have the meaning given to it in Schedule 4.<br><br>Permanent equipment (e.g., staging flooring, generators, sound towers, seating and video screens) as fully set forth on Schedule 5 shall remain in the Stadium throughout the period from the start of the First License Period through the Conclusion of the Sixth |

| | |
|---|---|
| | License Period ("Permanent Equipment") for use by Stadium programming on non-Event days. |
| **Staffing to be Provided by RBA** | RBA shall be responsible for Event-day operations for each Event including ticket takers, ushers, security, police, emergency medical, janitorial and box office personnel. Licensee will reimburse RBA for all costs associated with the provision of these Stadium-related staffing and operational personnel. All such costs shall be deemed Costs and Expenses for purposes of this Agreement. The Parties will discuss Stadium-related staffing and operational personnel costs at least forty-eight (48) hours in advance of each Event. |
| **Licensee Responsibilities** | Licensee is responsible for booking the Performing Acts for each Event and for securing performance guarantees from each of the Performing Acts for each Event. Such performance guarantees shall be provided to RBA for its records.<br><br>In addition, Licensee will be responsible for:<br>• Event marketing (with specific support from RBA as outlined below);<br>• staging the Events;<br>• Performing Acts settlement; and<br>• coordinating and facilitating production requirements with RBA with respect to the Events.<br><br>RBA will provide the following marketing and promotional benefits in connection with the Event:<br>• Red Member and Partner Presales;<br>• Press release;<br>• Posts on Stadium's official social media channels including Instagram, Facebook, and TikTok and on the Stadium's official Web site;<br>• RBA's affiliate, Red Bull New York, Inc., will endeavor in good faith to promote the Event on RBNY's official social media channels including Instagram, Facebook, and TikTok and on the affiliates official Web site;<br>• RBA will include information regarding Event on-sale to its ticket buyer and youth programs distribution lists;<br>• RBA will display a site graphic at the Stadium inclusive of upcoming events including the Event;<br>• In-Stadium LED signage during certain New York Red Bulls regular season matches, with specific matches, designated times and durations of the signage to be determined by RBA in its sole discretion.<br><br>Licensee to provide RBA with promotional assets for the Event at its sole cost and expense within ten (10) days of public announcement of each Event. Licensee acknowledges that the provision the marketing and promotional benefits set forth above is contingent on RBA receiving the Event assets in accordance with such timeframe. |
| **Ticket Charges and Fees** | $15.00 per ticket; provided, that if the average ticket price is projected to be under $100.00 per ticket (as determined by RBA in its reasonable discretion); $10.00 per ticket (the "Box Office Service Charge"), solely retained by RBA, subject to the Complimentary Ticket Threshold below.<br><br>In the event that Licensee stages at least six Events during the Term, Licensee shall receive a rebate of: (i) $5.00 per ticket sold if the Box Office Service Charge is $15.00 for the applicable Event; or (ii) $3.00 per ticket sold if the Box Office Service Charge is $10.00 for the appliable Event.<br><br>If the License does not stage at least six Events during the Term, Licensee shall receive a rebate of: (i) $3.75 per ticket sold if the Box Office Service Charge is $15.00 for the |

| | |
|---|---|
| | applicable Event; or (ii) $1.50 per ticket sold if the Box Office Service Charge is $10.00 for the applicable Event.<br><br>$5.00 per ticket ("Ticket Agency Fee"), solely retained by RBA regardless of the Box Office Service Charge above.<br><br>New Jersey sales tax and credit card charges to be added to the ticket price at the following rates: New Jersey Sales Tax at 6.625% and Credit Card Fee at 2.9%.<br><br>There will be a $0.30 per ticket transaction fee.<br><br>All fees shall be paid in accordance with payment settlement for the applicable License Period in accordance with the terms of this Agreement. |
| **Complimentary Tickets** | RBA shall receive 150 complimentary tickets for each Event with locations mutually agreed by the Parties. Licensee will receive no more than 350 complimentary tickets per Event. The 500 complimentary tickets shall be referred to as the "Complimentary Ticket Threshold".<br><br>The complimentary tickets shall consist of contiguous seats of four (4). In the event Licensee desires to distribute any other complimentary tickets for the Event in excess of the Complimentary Ticket Threshold, the Box Office Service Charge shall apply.<br><br>For the avoidance of doubt, any additional complimentary tickets requested by either Party shall incur the Box Office Service Charge. The Parties agree that all tickets for the Match shall (i) reflect the pricing that has been mutually agreed upon and (ii) shall not include any complimentary features, packages, promos (including, without limitation, food and/or beverage packages, promotional giveaways (such as bobbleheads), VIP/meet & greets/experiential packages, etc.) unless otherwise expressly approved by Licensee. |
| **Food and Beverage Revenue Share** | Net concession revenue received by RBA from its official food and beverage concessionaire will be retained 100% by RBA. |

| | |
|---|---|
| **Hospitality** | Suites:<br><br>Licensee shall receive up to four (4) suites for each Event (Suites 416, 417, 516 and 517; each suite including 17 Seats per suite plus two valet parking passes) to use for internal/hospitality purposes or to sell to third-parties (the "Licensee Suites"). Licensee shall be required to offer any suites for sale at the market rates determined by Licensor.<br><br>All remaining suites may be sold by RBA, for which RBA shall retain 100% of the net revenue received from the applicable sale (e.g., less taxes, fees and F&B expenses). Licensee shall retain 100% of the net revenue received from the sale of each Licensee Suites (as defined above) (e.g., less taxes, fees, and F&B expenses). In the event Licensee sells each of its Licensee Suites, RBA may grant Licensee the right to sell an additional amount of mutually agreed upon suites as set forth herein, for which each of Licensee and Licensor will receive 50% of the net revenue received from such sale.<br><br>The prices for all suites will be set by RBA.<br><br>Box Seats<br><br>• RBNY Box Seats Members have the first right of refusal to purchase their box seats locations for each Event. The price of the Box Seats for the Events will be determined at the sole discretion of Licensee. RBA will be responsible for communicating the offer to RBNY Box Seats Members and will provide in that communication a mutually agreed upon deadline by which the inventory may be purchased. In the event a Box Seat Member does not opt-in to purchase the inventory for any Event, Licensee may sell such inventory to third parties all retain 100% of the revenue derived therefrom, less applicable fees.<br><br>Managers Box (Section 109M and 110M)<br><br>If any of the Managers Box Seats are not redeemed by its holder, RBA shall have the right to utilize such Managers Box Seats for internal and prospecting purposes (i.e., not for sale). |
| **Premium Spaces** | Club SI may operate on an all-inclusive basis for food, non-alcoholic beverages and alcoholic beverages. If open, it may be offered to ticket buyers in Sections 109 and 110, in which case associated catering costs will be included in the ticket price.<br><br>All catering costs payable to RBA's food and beverage concessionaire, Levy Premium FoodService Limited Partnership ("Levy"), and associated with the operation of the SI Club shall be the sole responsibility of Licensee (as between the parties), unless otherwise mutually agreed in writing by Licensee and Levy.<br><br>The Audi Club shall be closed to the public, but may be used by Licensee for operational purposes at no additional cost during each Event.<br><br>Ticket pricing for access to Club SI shall be determined by Licensee, in consultation with RBA. Any costs related to food and beverage (including alcoholic beverages) that are included in the ticket price must be approved by Levy prior to the commencement of ticket sales.<br><br>The Hype House will operate as a hospitality lounge and open to Ticket Holders during the Events. |
| **Consignment Tickets** | Licensee may sell Event tickets on a consignment basis ("Consignment Tickets"), in lots of up to 1,000 tickets, subject to the following terms: |

| | |
|---|---|
| | (a) upon execution of this Agreement and at Licensee's written request, RBA will provide an initial lot of 1,000 Consignment Tickets ("Initial Ticket Lot") within 24 hours prior to the general public on-sale date;<br>(b) additional lots of 1,000 tickets ("Additional Ticket Lot") may be requested only after the Initial Ticket Lot has been fully settled per clause (c);<br>(c) Licensee must settle each lot of Consignment Tickets within 15 days of sale ("Consignment Settlement Date"), by paying RBA the full amount received, including: (i) face value, (ii) Box Office Service Charge, and (iii) Ticketing Agent Fee. Payment must be made via cash or wire transfer to an account designated in writing by RBA. Unsold tickets must be returned no later than 48 hours prior to the applicable Event. Licensee can also return or retain any unsold tickets provided that the available Lots do not exceed 1,000 tickets at any given time;<br>(d) RBA will advance 50% of the amount owed under clause (c), excluding taxes, the Ticketing Agent Fee and 50% of the Box Office Service Charge, which shall be paid in full at the time of settlement for each lot ("Consignment Advance");<br>(e) all outstanding Consignment Tickets must be settled no later than the night of the applicable Event;<br>(f) RBA may, in its discretion, cancel any Initial or Additional Ticket Lots—or individual tickets within such lots—not settled per these terms;<br>(h) ticket pricing for Consignment Tickets will be determined by Licensee, in meaningful consultation with RBA; and<br>(i) issuance and delivery of Consignment Tickets are subject to Ticketmaster's prior written approval. |

| | |
|---|---|
| **Event Sponsorships** | Licensee will have the right to secure sponsorship opportunities for the Events ("Event Sponsorships") in mutually agreed upon areas of the Stadium. Licensee shall retain 80% of net revenue for all Event Sponsorships and shall pay 20% to RBA in connection with Settlement; provided, that RBA may refer sponsorship opportunities to Licensee and if such introduction results in a sale, RBA shall receive 50% of the net sponsorship revenue received from such sponsorship opportunity.<br><br>For purposes of this section, net revenue shall mean gross revenue received from the Event Sponsorship Agreement less activation/hard costs and commissions payable to Red Bull New York employees.<br><br>Licensee acknowledges and agrees that all rights granted by Licensee to a sponsor in connection with an Event Sponsorship shall be memorialized in a written agreement between the sponsor and Licensee (each, an "Event Sponsorship Agreement"); and Licensee will:<br><br>• not grant any Event Sponsorships to any Energy Drink Competitor (as defined in Section 6.7) or for any product that promotes or claims to promote Energy Benefits (as defined in Section 6.7);<br>• not be entitled to sell or grant Event sponsorships to a person (or that of any group, holding, associated or affiliated company of such person) related to a prohibited category (as conveyed by RBA);<br>• ensure any sponsor on-site activation rights or benefits shall be subject to RBA's prior written approval.<br><br>Licensee agrees that RBA retains and reserves the right to display, market and promote any of its or the New York Red Bulls' pre-existing sponsors in accordance with the terms of the sponsorship agreement with each such sponsor. Event sponsors may only activate within the Stadium seating bowl during the Event. |
| **Parking** | The Parties will mutually agree on a number of parking passes, no less than 100, and no more than 200, to be made available for public sale in the red and silver parking lots. |

| | |
|---|---|
| **Stadium Programming Fee** | Licensor agrees to pay Licensee $2.00 per "General Admission" ticket sold to Stadium programming that takes place during the Term on non-Event dates ("Stadium Programming Fee"). The Stadium Programming Fee shall be paid to Licensee in accordance with settlement procedures set forth on Section 3 of the Agreement. |

**IN WITNESS WHEREOF,** the Parties have entered into this Event License Agreement as of the Execution Date.

**RED BULL ARENA, INC.**

DocuSigned by:
Luis Garcia Vazquez
77AF108BD82D443...

By: ________
Name: Luis Garcia Vazquez
Title: CFO

29 April 2026

**NVRDUL EVENTS, LLC**

Signed by:
20E5F3E21C3E4AB...

By: ________
Name: Carri Hyde
Title: CEO

28 April 2026

**Attachments:**

Exhibit A – Terms and Conditions
Schedule 1 – Estimate of Costs and Expenses
Schedule 2 – Insurance Guidelines

Schedule 3 – Site Plan

Schedule 4 – License Periods

Schedule 5 – Permanent Equipment

**EXHIBIT A**

**Terms and Conditions**

1. **Licenses.**

1.1. Grant of License. During each License Period, which includes load-in and load-out, RBA hereby grants to Licensee a non-exclusive, limited license (the "License") to enter the Property to conduct the applicable Event for such License Period, with the understanding that such permission extends solely to entry into the portion of the Property controlled by RBA. While on the Property, Licensee agrees to comply in all respects with the directions of RBA's personnel or any representative of RBA. Following the conclusion of each applicable License Period, Licensee hereby grants RBA the right to use the Permanent Equipment (as defined in this Agreement) and set forth on Schedule 5.

1.2. License to Film; Photograph. Licensee shall have the right to film, photograph, record or otherwise reproduce, in any manner or through any media, the applicable Event, including Event participants, staff, invitees and/or employees, and any parts thereof (each a "Licensee Recording"). Licensee shall not authorize the live audio, audiovisual or electronic broadcasting of any Licensee Recording without RBA's prior written approval. Licensee agrees that it shall be solely responsible for all costs and liability associated with any recording of the Event. Licensee shall also ensure that all recording will be produced in accordance with Stadium safety protocol and industry standards. Licensee shall be solely responsible for obtaining, at its own expense, any and all rights, licenses, permissions, and clearances necessary to lawfully film, record, use, distribute, and exploit the Event and all content captured therein, including but not limited to:

(a) Performance rights and recording permissions from all artists, performers, and talent;

(b) Synchronization and master use licenses for any musical compositions or sound recordings used or performed;

(c) Any required permissions from unions, guilds, or performing rights organizations;

(d) Releases or consents from audience members, crew, or any individuals appearing in the footage, where necessary; and

(e) Rights to use names, likenesses, voices, trademarks, or other intellectual property included in the filmed material.

RBA shall have no responsibility for securing any rights or clearances related to the filming or recording of the Events, and makes no representation or warranty regarding the ownership or availability of any such rights.

RBA shall have the right, to film, photograph, record or otherwise reproduce, in any manner or through any media, the Event, including Event participants, staff, invitees and/or employees, and any parts thereof (each a "RBA Recording"). RBA may display, use, or otherwise exploit any RBA Recording for internal and archival purposes and for marketing and promotion of the Stadium in perpetuity. RBA does not have the right to use the artist name, image or likeness in marketing and promotional materials without the prior written consent of Licensee.

1.3. Reservation of Rights. Except as otherwise set forth in this Agreement, RBA expressly reserves unto itself any and all rights regarding the Property and any constituent elements thereof, with respect to television, radio, motion picture coverage, video, audio or electronic recording of any kind and in any media now known or hereafter developed that are not explicitly licensed to Licensee hereunder. In addition, RBA expressly reserves to itself the use of the Property before, during and after the Events for the purpose of performing its obligations hereunder and for all other purposes, provided that such usage does not intentionally materially conflict with Licensee's ability to stage and execute the Events. Notwithstanding the foregoing, should RBA have reason to believe an emergency exists or is threatened, RBA shall, as promptly as practicable, notify Licensee of the emergency or threat as appropriate and be entitled to take all such actions and to proceed at all such times that RBA shall deem appropriate following consultation with Licensee. Licensee acknowledges and agrees that RBA will have its surveillance cameras in operation at the Property during the Term for security purposes.

2. **Use of Stadium.**

2.1. Purpose. At all times during the Term, Licensee shall use and occupy the Property solely for the Events and activities ancillary thereto and for no other purpose.

2.2. Equipment and Materials. Except as otherwise set forth in this Agreement, Licensee shall be responsible, at its sole cost and expense, for providing all equipment and materials necessary for the Licensee to produce the Events,

including all personnel, barriers, cameras, lighting, sound and other equipment. RBA shall not be obligated to provide any such equipment and materials, but RBA will provide "shore" power for the artist buses and may provide such other equipment if RBA is willing and able to provide and such equipment is requested by Licensee (and, for the avoidance of doubt shall be a Cost and Expense as defined in Section 3.1(b)).

2.3. Merchandise. Licensee agrees that R&R has the exclusive right to operate all merchandise concessions at the Property (and its surrounding areas). Licensee shall negotiate and contract directly with R&R regarding any merchandise sales. Notwithstanding the foregoing, RBA (or its designee) shall be entitled to control and retain 100% of all revenue derived from the sale of merchandise during the Event (other than Event-related merchandise) through the Bull Shop and other Red Bulls merchandise stands on the Property.

2.4. Food and Beverage. Licensee agrees that Levy has the exclusive right to operate all catering and food and beverage concessions at the Property except as agreed upon in writing by each of Levy, Licensee, and RBA. (a) RBA shall be entitled to control and retain 100% of all food and beverage sales during (or related to) the Event and (b) Licensee agrees that RBA has final approval (to be provided or withheld in its sole and absolute discretion) with respect to any products sold at the Stadium (or its immediate surroundings) in relation to the Event.

2.5. Setup and Dismantle. Licensee shall install on the Property the personal property and equipment for the Event as outlined in the Event site plan attached here to as Schedule 3. Licensee shall be responsible for all set-up and breakdown of the equipment (and to repair any damage thereto) at Licensee's sole cost and expense. Licensee agrees to sectionalize the set-up and breakdown to ensure minimal impact on the use of the Stadium by RBA or other licensees, tenants, or occupants of the Property. The installation and removal of all of Licensee's equipment shall be made promptly, in a good and workmanlike manner, by duly licensed contractors and subcontractors in accordance with all applicable law and all requirements of RBA. Notwithstanding the foregoing, at all times during the Term, Licensee shall, at its sole cost and expense, keep the Property in a safe condition, ordinary wear and tear excepted, in accordance with all applicable law and at RBA's reasonable direction.

2.6. Alteration. Except as specifically permitted herein, the Property shall not be altered, improved or changed in any manner without the prior written approval of RBA, or verbal approval if time is of the essence, which approval may be withheld in RBA's sole and absolute discretion. If Licensee makes or performs any additions, alterations, or improvements without the written consent of RBA, such event shall be a material breach of this Agreement.

2.7. Damages. Licensee shall be solely responsible for all costs incurred by RBA in connection with the repair, replacement, or restoration of any damage to the Property resulting from the Event ("Damages"). Promptly after the conclusion of the Event, RBA shall arrange to have any Damages repaired, restored, or replaced. In order to expedite Licensee's payment for repairs resulting from the Damages, no later than three (3) business days following the Event, if commercially reasonable to do so by such date, RBA shall provide an invoice with supporting documentation to Licensee for the actual costs of repairs resulting from the Damages (the "Damages Invoice"). Licensee shall pay to RBA the full amount of the Damages Invoice pursuant to Section 3.1(c).

2.8. Liens. Licensee, at all times, shall keep RBA and the Property free and clear from any claim, lien or encumbrance, tax lien or levy, mechanic's lien, attachment, garnishment or encumbrance arising directly or indirectly from any obligation, action or inaction of Licensee whatsoever. In the event any lien is filed against RBA or the Property as a result of any activity by Licensee, if Licensee fails to remove such lien within two (2) business days of written notice from RBA, RBA may, but shall not be required to, pay the amount of the claim and any costs, and the amount so paid, together with attorneys' fees incurred in connection therewith, shall be immediately due and owing from Licensee to RBA.

2.9. Security. Licensee agrees that RBA has the exclusive right to select and hire security personnel for the Event for its own benefit, and RBA hereby agrees to do so; provided that Licensee shall be responsible for any and all costs associated with providing such security personnel required on the Property during the License Period (collectively, the "Security Costs").

2.10. Medical. Licensee agrees that RBA has the exclusive right to select and hire medical personnel for the Event for its own benefit, and RBA hereby agrees to do so; provided that Licensee shall be responsible for any and all costs associated with providing such medical personnel required on the Property during the production of and preparation for the Event (collectively, the "Medical Costs").

2.11. No Representations. By entering upon and occupying the Property, Licensee is deemed to have accepted the Property as delivered and RBA shall not be liable for any patent or latent defect therein. Licensee acknowledges and agrees that neither RBA nor any of RBA's agents, employees, servants, or contractors have made any representations or warranties concerning the Property or any other matter or things affecting or related to the Property except as expressly set forth herein, and all risks

incident thereto are to be borne by Licensee. Licensee acknowledges it has inspected the Property and the Property is satisfactory to it for the conducting of the Event.

2.12. Summary Dispossess Proceeding. If Licensee fails to surrender the Property to RBA at the end of the License Period, then RBA may enter the Property and remove all persons therefrom by summary dispossess proceedings, or by any suitable action or proceeding at law, or by force or otherwise, without being liable for indictment, prosecution, or damages to any party therefor. Licensee agrees that if RBA commits any summary dispossess proceeding against Licensee, Licensee shall not impose any counterclaim of whatever nature or description in any such proceeding. RBA may also remove all of the property of Licensee, its employees, guests, or contractors, or any property brought onto the Property by any of the foregoing which remains in or on the Property, and store it or dispose of it, as determined by RBA in its sole and absolute discretion. Nothing contained herein shall in any way constitute RBA as a bailee of any such property, whether owned by Licensee or any other person. Any removal and disposition or storage shall be at Licensee's sole cost, expense, and risk and the cost of such shall be payable to RBA. For any such additional periods which such property of Licensee, its employees, guests, or contractors remains on the Property, Licensee shall pay to RBA a storage fee in an amount to be determined in RBA's reasonable discretion. Unless other arrangements are made by the Parties, any property that remains in RBA's possession for thirty (30) days will be deemed abandoned and shall become RBA's property without further notice.

**3.** License Fee; Costs and Expenses; Permits; Taxes; Etc. Licensee shall pay, as and when due, unless otherwise expressly set forth herein, all fees, costs and expenses arising from or relating to Licensee's use of the Property, including such fees, costs and expenses arising from or relating to the following:

3.1. License Fee; Costs and Expenses.

(a) License Fee. [Intentionally Omitted]

(b) Costs and Expenses. Licensee shall be responsible for all costs and expenses incurred by RBA in connection with each Event (collectively, the "Costs and Expenses"), including all Security Costs, Medical Costs, information technology costs, audio visual production costs, field replacement or field cover costs or any other costs relating to the production of the Events which (but for the Event) RBA would not have otherwise incurred. The current estimate of the Costs and Expenses for the Events are attached hereto as Schedule 1. RBA shall have the right to deduct the Costs and Expenses from ticket sales made as of the day before each Event. To the extent actual Costs and Expenses incurred exceed the estimated Costs and Expenses, the difference between the actual Costs and Expenses and estimated Costs and Expenses (the "Remaining Costs and Expenses") shall be due and payable to RBA as set forth in Section 3.1(c).

(c) Payment; Settlement.

(i) Preliminary Settlement – On the first Wednesday after three (3) business days following each Event, RBA shall provide an estimate of the Box Office Service Charges, Ticket Agency Fees, and estimated Costs and Expenses and payment to Licensee equal to 85% of (i) the Event box office revenue irrevocably and actually received by RBA (net of any taxes, Box Office Service Charges, Ticket Agency Fees, credit card fees and/or chargebacks, or other similar charges), minus (iii) the Remaining Costs and Expenses, each with respect to the applicable Event.

(i) Final Settlement - Within 30 business days of each Event RBA shall provide an invoice with supporting documentation for the Box Office Service Charges, Ticket Agency Fees, and actual Costs and Expenses and payment to Licensee equal to (i) the Event box office revenue irrevocably and actually received by RBA (net of any taxes, Box Office Service Charges, Ticket Agency Fees, credit card fees and/or chargebacks, or other similar charges), plus Licensee Merchandise Revenue Share, minus (iii) the Remaining Costs and Expenses plus (C) any amount paid by RBA as part of the Preliminary Settlement plus (D) the amount on the Damages Invoice (if then available). If the Damages Invoice is not then available, Licensee shall pay the Damages Invoice within fifteen (15) business days following receipt of the Damages Invoice.

3.2. Licenses and Permits. Licensee shall pay all permit, license, safety, production and any other costs, fees and expenses related to each Event (other than those costs, fees and expense for which RBA expressly agrees hereunder to be responsible in accordance with Schedule 1). In addition, within fifteen (15) days prior to the commencement of the License Period, Licensee shall provide RBA with copies of all applicable approvals, licenses and permits required for Licensee to conduct the Event, including any approvals, licenses and permits required by Harrison Township, Hudson County, or the State of New Jersey. Licensee shall maintain in good standing throughout the Term, at its cost, all approvals, licenses and permits (collectively, "Approvals") required to present the Event and fulfill its obligations under this Agreement. Without limiting the foregoing, as applicable, Licensee shall be solely responsible for obtaining any and all licenses, rights and permissions from any applicable third parties arising from Licensee's use of any (a) copyrighted music, including licenses from the proper

performing rights organizations (i.e. ASCAP, BMI & SESAC); and (b) patented, trademarked or copyrighted devices, processes or other materials used during or in connection with the presentation or advertising of the Event (with (a) and (b) included as Approvals for purposes of this Agreement). In all events Licensee shall be solely responsible for the payment of any royalties, fees and/or other costs due or payable to any such third parties arising from the uses set forth in the immediately preceding sentence.

3.3. Taxes. Licensee shall pay all taxes imposed as a result of or in connection with the Event or Licensee's or its invitees' other uses of the Property (or any improvements thereon that result from Licensee's production of the Event).

3.4. Assessment and Penalties. Licensee shall pay all assessments, levies or penalties of any governmental authority against RBA as a result of the Event or Licensee's or its invitees' other use of the Property (or any improvements thereon that result from Licensee's production of the Event), except if caused by RBA's sole negligence or willful misconduct in carrying out its obligations.

**4.** Term and Termination.

4.1. Term and Termination. This Agreement commences upon the Execution Date and terminates upon expiration of the Sixth License Period, unless otherwise earlier terminated in accordance with the terms set forth herein. RBA may terminate this Agreement following a breach of this Agreement by Licensee that (if curable) remains uncured for a period of five (5) business days following written notice by RBA to Licensee. For the avoidance of doubt, any failure to make payment in accordance with the terms contained herein shall be deemed a breach of this Agreement. Notwithstanding the foregoing, RBA may terminate this Agreement immediately if a material breach occurs within ten (10) days prior to the Event upon written notice to Licensee. For the avoidance of doubt, the following shall be deemed a material breach: (a) an Event of Insolvency; (b) failure by Licensee to pay any amounts when due; or (c) any additions, alterations, or improvements in violation of Section 2.7. For purposes of this Agreement, an "Event of Insolvency" shall mean any of the following with respect to the Licensee: (i) the institution by or against Licensee of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of either Party's debts, (ii) upon Licensee making an assignment for the benefit of creditors, or (iii) Licensee's dissolution or ceasing to do business.

4.2. Effect of Termination. Upon any termination or expiration of this Agreement the following shall occur: (a) all obligations of both Parties under this Agreement will terminate, except such obligations that survive termination as expressly set forth in Section 23; (b) Licensee shall cease using in any manner the intellectual property of RBA and RBA shall cease using in any manner the intellectual property of Licensee; (c) Licensee shall take all actions required at its sole cost and expense to return the Property to the condition existing prior to the License Period; (d) Licensee shall immediately remove its personnel, materials, equipment, and personal property from (and vacate) the Property; (e) Licensee shall be required to pay RBA the unpaid balance of all Costs and Expenses actually expended or incurred by RBA upon the date of termination within fifteen (15) days of written demand from RBA; Licensee agrees that such amount is a fair and reasonable estimate of RBA's damages under the circumstances.

**5.** Ticket Sales.

5.1. Ticketing for the Event. At Licensee's sole cost and expense, RBA shall provide box office services to Licensee for all ticket sales made at the Stadium. Licensee acknowledges and is aware that RBA's exclusive ticketing agent for the sale and distribution of all tickets is Sports Illustrated Tickets (the "Ticketing Agency"). All ticket sales and ticket-related services for the Event, such as ticket printing, shall be made only through RBA's box office, through other means designated by RBA or as approved by RBA, except where the nature of the Event requires a ticket design that cannot be provided through the ticket sales/distribution systems designated by RBA.

**6.** Advertising and Promotion.

6.1. General. Licensee agrees that all advertising and promotion of the Event will be truthful and accurate, and conducted at the sole expense of Licensee. In all printed, radio, television, and other advertising matter, the name of the Stadium shall be shown as the name of the Stadium (or such other name as RBA shall provide in writing to Licensee). Prior to any advertisement of the same, RBA must have specifically approved in writing, the use of its name(s) or logo(s), as well as Event titles or descriptions, hours, and operation and ticket purchasing procedures and pricing. At no time shall such advertising matter or programs be posted, distributed or circulated in or around the Property without RBA's prior written approval.

6.2. Venue Signage. Licensee understands and agrees that RBA or its designees or agents have entered into signage and sponsorship relationships related to the Stadium for which RBA (or such designee or agent) will exclusively retain

all revenues with no right of participation by Licensee. RBA reserves all rights to display signage in and around the Property. No signs or advertising boards promoting third parties will be allowed into the Property unless specifically approved in advance in writing by RBA. Licensee shall not mark, cover or attempt to modify or obscure any signage in or around the Property.

6.3. Digital and Static Advertising Systems. Licensee may not use any digital or static Stadium advertising systems/spaces outside of the seating bowl for commercial advertising. RBA shall have the right to use all Stadium advertising and signage systems located in the concourses, as applicable, throughout the Event, and shall have no obligation to share with Licensee any of the revenues derived from such commercial advertising. RBA reserves the right to use any and all Stadium digital signage systems within the Stadium bowl for New York Red Bulls and Stadium sponsors in accordance with the applicable sponsorship agreements.

6.4. Public Address System. Unless RBA provides prior written approval, Licensee shall have no right to broadcast commercial messages on the Stadium's public-address system.

6.5. Reservation of Rights. Unless otherwise provided herein, RBA reserves all rights to sell or license all advertising in any part of the Stadium.

6.6. Emergency Broadcasting. RBA may, at such times as it may deem appropriate or necessary, including during the License Period, announce, describe and advertise over the sound system and any other medium in and around the Stadium, any descriptions and advertisements concerning any other future event to be held in the Venue or elsewhere, or any emergency messages.

6.7. Energy Drink Competitors. Licensee shall not, and shall not permit any third party to, endorse and/or promote any Energy Drink Competitor, or carbonated beverage other than Red Bull products in and around the Property or in connection with any Event. For purposes of this Agreement, "Energy Drink Competitor" means any person, entity or organization that manufactures, licenses, supplies, distributes, markets, advertises, or sells: (a) any beverage product of any kind (whether in ready-to-drink, frozen, concentrate or powder form), including any beverage which claims, or is promoted, to improve personal energy, physical or cognitive performance, endurance, vitalization, or comparable benefits (collectively, "Energy Benefits") regardless of how or where the claims are made or who makes them, and any cola beverage; or (b) any non-beverage food, solid product or other category of goods (whether in bar, gelatin, gel, or other solid form) which claims or is promoted to have Energy Benefits, regardless of how or where the claims are made or who makes them. For the avoidance of doubt, Energy Drink Competitor, includes, without limitation, the following brands: 180, 5-Hour Energy, AMP, Banzai, Battery, Bawls, Base Energy, Boo Koo, Cintron Energy Enhancer, Crunk, Celsius, Diesel, Full Throttle, Go Fast, Go Girl, Howling Monkey, Hustler, Jeff Gordon, Kore, Lost Big Gun, Lost Five-O, Lost Perfect 10, Monster Energy, Mother, Sobe No Fear, Piranha, Pure G, Red Rain, Red Fuel, Relentless, RELOAD, Rip It, Roaring Lion, Rockstar, Rushh, Shok, SoBe Adrenaline Rush, Spike Shooter, Sun Tzu, Tab Energy. V/Sugarfree V, Glaceau Vitamin Energy Drink (non-water), Von Dutch, Wired, XS Energy Drink, and all diet, low calorie and/or sugar-free versions thereof.

**7.** Staffing. Except as otherwise set forth in the Basic Agreement, at all times during the License Period, Licensee shall adequately staff the Property with competent Event production and safety crews. Licensee shall be responsible for all salaries, employee benefits, social security taxes, federal and state unemployment insurance and any and all similar taxes relating to its employees and the production crew and for worker's compensation coverage with respect thereto pursuant to applicable law. Licensee shall be responsible for verifying its employees' and the production crew's work authorizations under all federal applicable law, including any necessary employment verification process under the Immigration Reform and Control Act of 1986, as amended, before such employees or contractors perform services at the Property. RBA shall have no control over Licensee's employment practices except as specifically provided herein. Licensee shall not cause or permit its employees or contractors to enter upon those areas of the Property that are designated "Employees Only" and the Parties acknowledge that for the purpose of this sentence, "Employees" refers to the employees of RBA and its other licensees, contractor, agents, tenants and occupants, as applicable, and not to the employees or contractors of Licensee. Licensee's employees and contractors shall enter and exit the Property wherever reasonably specified by RBA. Notwithstanding anything herein to the contrary, in the event that the terms and provisions of any collective bargaining agreements applicable to RBA, its tenants, licensees or occupants require that Licensee engage the services of any of RBA's employees, Licensee hereby expressly covenants and agrees to comply with such requirements and to reimburse RBA for all salaries, employee benefits, social security taxes, federal and state unemployment insurance and any and all similar taxes relating to employees and for worker's compensation coverage and other costs and expenses associated with or resulting from such services performed by RBA in connection with the Event.

**8.** Representations, Warranties And Covenants. Licensee for itself and on behalf of each of its licensees, agents, servants, employees and independent contractors (the "Licensee Parties") hereby makes the following representations, warranties and covenants to RBA, each of which shall be true and correct on Execution Date and at all times thereafter during the Term:

8.1. Licensee agrees that, while on the Property, Licensee shall cause the Licensee Parties (a) to conduct themselves in conformity with conventional public standards of behavior for family entertainment, conventional and traditional morals and standards of decency; (b) to not commit any act or do anything that could tend to degrade Licensee, RBA or subject RBA or its officers, directors, agents, servants or employees to public scorn, hatred, contempt or ridicule; and (c) cause the Licensee Parties to always conduct themselves in a courteous fashion toward any and all guests, customers or patrons of RBA notwithstanding that said guest, customer or patron could be hostile to Licensee and/or any of the Licensee Parties.

8.2. In its performance of this Agreement, Licensee shall fully comply with all applicable law, ordinances, rules and regulations governing the Event as well as RBA's Stadium Code of Conduct, which Licensee acknowledges has been provided to it by RBA and confirms it has read and understands. In addition, while on the Property, Licensee shall cause each of the Licensee Parties agrees to cooperate in all respects with the reasonable directions of all RBA personnel, any other authorized representative of RBA or any Harrison, New Jersey or State of New Jersey law enforcement or fire department personnel. RBA shall, at all times, use reasonable effort to cooperate with Licensee's reasonable direction that relates to Licensee's effort toward preparation and production of the Event.

8.3. At all times during the License Period, Licensee shall: (a) not use or permit the use of any portion of the Property for any unlawful purpose, not perform any act or carry on any practice that may injure the Property or any person, or cause any offensive odors or loud noise or constitute a nuisance or a menace (with the exception of noises etc. related to normal event production, with the understanding that Licensee shall comply with reasonable requests of RBA related to noise reduction); (b) except as permitted hereunder, not keep, use, store or discharge, or allow to be kept, used, stored or discharged, upon or about the Property, any hazardous substance, pollutant, contaminant, waste, byproduct or constituent that may damage or endanger any part of the Property or the occupants, patrons or invitees of Licensee or RBA, or in contravention of all applicable law; (c) comply with all Approvals (as defined in Section 3.2); (d) not obstruct any portion of the sidewalks, entries, passageways, doors, aisles, elevators, vestibules, or way of access to the public utilities of the Stadium, or use any of the foregoing for any purpose other than ingress and egress; and (e) not obstruct any windows, ventilators or lighting fixtures of the Stadium.

8.4. Licensee acknowledges that the use of illegal substances by any of the Licensee Parties is strictly prohibited on the Property.

8.5. Licensee understands and agrees that should RBA have a reasonable good faith belief that, while on the Property, any of the Licensee Parties is under the influence of any intoxicating substance or drug and behaving in a manner that violates acceptable conduct for an RBA guest, RBA may take all action necessary to remove such individual from RBA's controlled property and Licensee understands and agrees that such individual shall not be allowed to re-enter the Property for any purpose and RBA shall bear no responsibility to Licensee with regard to any effect such removal may have on Licensee's ability to complete the Event.

8.6. Licensee represents and warrants that: (a) it has the full right and authority to enter into this Agreement and perform all of its obligations hereunder, and this Agreement constitutes a valid, binding and enforceable agreement against it; (b) the execution, delivery and performance of this Agreement will not violate the provisions of any agreement to which it is a party or by which it is bound; (c) it shall perform its obligations under this Agreement in accordance with all applicable federal, state and local laws and regulations; (d) it has the right to grant all rights conferred to RBA under this Agreement free and clear of all liens and encumbrances; (e) RBA's exercise of the rights described under this Agreement will not cause it to infringe or violate the copyright, trademark, publicity, privacy, contract or other right of any third party; (f) there is no action, suit or proceeding before any court or governmental body, now pending or, to Licensee's knowledge, threatened against or seeking to prevent Licensee's performance of its obligations under this Agreement; and (g) it shall, at its own cost, apply for and secure any and all permits, licenses or other consents which may be required in connection with the Event.

**9.** Indemnification; Limitation of Liability.

9.1. Indemnification. Licensee agrees to indemnify, defend, and hold harmless RBA, its current and future affiliates, and each their respective equity holders, officers, directors, members, managers, partners, principals, licensees, employees, agents, advisors, and representatives, and the successors and assigns of each of the foregoing (collectively,

"RBA Parties") from and against all actions, claims, judgments, losses, damages, fines, penalties, costs, expenses or any other liabilities (including court costs and attorneys' fees) arising out of or related in any way to (a) the acts or omissions of any of the Licensee Parties; (b) the breach by Licensee of any of the representations, warranties, covenants, obligations or conditions contained in this Agreement; (c) any loss of or damage to the personal property of RBA, Licensee or any third party as a result of each of the Events, or bodily injury caused, or alleged to be caused by the acts or omissions of Licensee, any Licensee Party or an invitee of Licensee or any Licensee Party or any act related to the subject matter of this Agreement, including with respect to RBA's use of the Permanent Equipment for Stadium Programming during the Term; (d) the unauthorized use of RBA's or its affiliates trademarks, trade dress, or other protected intellectual property (e) claims that any of the Event marks or other intellectual property infringe, or are alleged to be infringing on, any third-party rights (provided RBA's use of any of Licensee's Event intellectual property has been approved by Licensee); and (e) any claim by any individual retained by Licensee to provide services for the Event related to allegations concerning unpaid wages owed to any such individual. Licensee assumes full responsibility for the character, acts, and conduct of any person admitted to the Property to attend or otherwise provide services pursuant to this Agreement and, to the maximum extent permitted by law, hereby waives and releases RBA and the RBA Parties from any such liability.

9.2. Limitation of Liability. UNDER NO CIRCUMSTANCES SHALL RBA BE LIABLE TO Licensee, WHETHER IN CONTRACT, TORT OR OTHERWISE, FOR ANY SPECIAL, INCIDENTAL, INDIRECT PUNITIVE, EXEMPLARY, OR CONSEQUENTIAL DAMAGES, ARISING OUT OF, OR IN CONNECTION WITH THIS AGREEMENT, ANY LOSS OF BUSINESS OR LOSS OF PROFITS, NOR ANY INJURY, DAMAGE OR LOSS OF LIFE EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES. RBA'S LIABLITY UNDER THIS AGREEMENT SHALL NOT EXCEED $50,000 or ACTUAL DAMAGES, WHICHEVER IS LESS.

**10.** Insurance. Licensee agrees to procure and maintain insurance coverage in connection with this Agreement and provide to RBA no less than fifteen (15) days prior to the commencement of the License Period the required proof of insurance as described in Schedule 2 attached hereto. The insurance coverage for security services and medical services may be supplied by third parties, however, the obligation for ensuring that such coverages are in place lies with Licensee. In addition, Licensee must: (a) ensure that Licensee's independent contractors contracted to perform in each of the Events name RBA, including its parent, affiliated or subsidiary corporations, and their respective agents, officers, members, directors, employees, successors and assigns, Red Bull North America, Inc., Red Bull New York, Inc., the Hudson County Improvement Authority and Harrison Township, New Jersey as additional insureds under any policies carried by such parties; (b) ensure that such insurance required under this sentence shall: (i) provide for cancellation of not less than thirty (30) days prior written notice to RBA; (ii) have a minimum A.M. Best rating of A; (iii) be primary and non-contributory with respect to any other insurance or self-insurance program of RBA; and (iv) provide a waiver of subrogation in favor of RBA; and (c) provide evidence of such insurance to RBA no less than thirty (30) days prior to the first Event.

**11.** Casualty. If, during the Term, all or any portion of the Property is damaged such that the Event cannot, in RBA's reasonable discretion, take place, then this Agreement shall terminate as of the date of such casualty. All compensation awarded by any policy of insurance or legal proceeding as a result of such casualty shall be the sole property of RBA and Licensee shall have no right, title or interest in and to same; provided that nothing herein shall limit Licensee's right to make any claim for any casualty to the improvements or Licensee's property.

**12.** Force Majeure. If, during the Term, either Party shall be delayed in or prevented from the performance of any of such Party's obligations under this Agreement by reason of: strikes, lockouts, unavailability of materials, failure of power, fire, earthquake or other acts of God, restrictive applicable law, governmental interference or military act, riots, insurrections, war, terrorist acts, epidemic, pandemic, national health emergency, or other reasons beyond either Party's reasonable control (each, an "Event of Force Majeure"), then the performance of such obligation shall be excused for the period of the delay; and if the Event cannot be rescheduled within ninety (90) days of the original Event Date (with the approval of each Party) then this Agreement shall be immediately terminated. In the event of a termination due to an Event of Force Majeure, Licensee shall reimburse RBA for any out of pocket expenses it incurred in connection with preparation for the Event.

**13.** Independent Contractor. During the Term, the relationship of Licensee to RBA shall, at all times, be that of an independent contractor. No Licensee Party shall be considered an employee of RBA and no Licensee Party shall be entitled to any benefits to which an employee of RBA would normally be entitled. This Agreement is not intended to create (nor shall it ever be deemed to have created) a partnership, joint venture, or any other similar relationship between the Parties, and neither Party shall have the right or authority to assume or otherwise create any obligation

or responsibility, express or implied, on behalf of or in the name of the other Party, or to bind the other Party in any manner whatsoever. This Agreement shall not be construed as creating or constituting a partnership or joint venture between any of the Parties.

**14.** Security. RBA may, in its sole and absolute discretion, prohibit any Licensee Party from being present on the Property at any time. At RBA's request, Licensee shall dismiss or remove from the Property any Licensee Party already on the Property, at RBA's sole request. Licensee shall cause the Licensee Parties to, at all times, comply with RBA's security procedures. If any Licensee Party is found in violation of such procedures by RBA, RBA may immediately remove such individual from the Property.

**15.** Governing Law; Venue. This Agreement shall be governed and construed in accordance with the laws of the State of New Jersey (without giving effect to its conflicts of law principles). The Parties irrevocably submit to the exclusive jurisdiction of the federal courts located in New York County, New York in connection with any disputes arising under this Agreement and waive any defense based on lack of jurisdiction, improper venue, or forum non conveniens. The Parties agree that the prevailing Party in any suit, action, or other proceeding arising out of or in connection with this Agreement shall be reimbursed by the other Party for all reasonable, out-of-pocket costs and expenses, including reasonable attorneys' fees, incurred by it in connection with such suit, action, or other proceeding.

**16.** Captions. The descriptive headings of the sections and subsections of this Agreement are for convenience only and do not constitute a part of the Agreement. The Parties do not intend for these headings to modify, amplify or give full notice of any of the covenants, terms, conditions, representations or warranties contained in this Agreement.

**17.** Severability. The illegality, invalidity, or unenforceability of any provision of this Agreement (as determined by a court of competent jurisdiction) shall not affect the legality, validity, or unenforceability of the remaining provisions, and this Agreement shall be construed in all respects as if any illegal, invalid, or unenforceable provision were omitted.

**18.** Assignment. Neither Party shall have the right to assign its rights or obligations under this Agreement, in whole or in part, without the prior written consent of the other Party; provided that RBA shall be permitted to assign this Agreement to any entity that controls, is controlled by, or is under common control with RBA or in connection with a merger, acquisition, reorganization, or similar corporate transaction upon written notice to Licensee.

**19.** Counterparts. The Parties may execute this Agreement in multiple counterparts, each of which shall constitute an original, and all of which shall, collectively, constitute only one agreement. The delivery of an executed counterpart signature page by facsimile, PDF, or electronic signature is as effective as executing and delivering this Agreement in the presence of the other Party to this Agreement.

**20.** Number And Gender. Any reference in this Agreement to the singular includes the plural where appropriate, and any reference in this Agreement to the masculine gender includes the feminine and neuter genders where appropriate.

**21.** Late Payment Interest. Licensee agrees that should it fail to pay RBA any amount when due, such amount shall accrue interest at the rate of one and a half percent (1.5%) per month or the highest amount permitted by applicable law, whichever is less.

**22.** Notice. Any notice, request, demand, consent or any other communication required to be given pursuant to this Agreement shall be in writing and be served upon the other Party by (a) personal delivery; (b) registered or certified mail, in each case, return receipt requested and postage prepaid; or (c) nationally recognized overnight courier, with all fees prepaid;. Each Party giving notice shall address the notice, if to RBA, to Red Bull Arena, Inc., 600 Cape May Street, Harrison, NJ 07029, Attn: General Counsel, and if to Licensee, to the address set forth in the Basic Agreement, or such other address as such Party shall designate in writing. Notices shall be deemed effective upon the date of receipt (or refusal of delivery).

**23.** Survival. The provisions set forth in Sections 1.2(b), 2.13, 3.1(c), 3.2-3.4, 4.2, 8, 9, 13, and 15-25, together with any other provisions of this Agreement (including payment provisions) that by their terms and nature are intended to survive such expiration or termination, shall survive the expiration or termination of this Agreement.

**24.** Merger. This Agreement, including the attached Exhibits and Schedules, shall not be supplemented, amended or modified by any course of dealing, course of performance or usage of trade. This Agreement and the attached Exhibits and Schedules contain the entire agreement by and among the Parties and all understandings and agreements heretofore by and among the Parties hereto are merged into this Agreement, and this Agreement shall supersede all

previous agreements by and among the Parties, whether oral or in writing, implied, or express and this Agreement may only be amended or modified by a written instrument duly executed by officers of all the Parties.

**25.** Confidentiality. Licensee agrees that the terms and conditions of this Agreement and any other information disclosed by RBA that is not generally known to the public or that Licensee should reasonably know to be confidential or proprietary to RBA (the "Confidential Information") shall be kept confidential by Licensee. Licensee shall not use, disseminate, or in any way disclose, directly or indirectly, any Confidential Information received from or through the RBA pursuant to this Agreement to any third party, unless RBA consents in writing to such disclosure or to the extent disclosure is required by court order, applicable law, or in connection with legal or administrative proceedings; provided that Licensee shall be permitted to disclose the Confidential Information on a need-to-know basis to its directors, equity holders, officers, affiliates, employees, agents, advisors, and representatives (collectively, its "Representatives") in connection with exercising its rights or performing its obligations under this Agreement so long as Licensee informs its Representatives of the confidential nature of the Confidential Information and directs its Representatives to treat the Confidential Information in accordance with the terms of this Section 25. If Licensee is required to disclose any Confidential Information pursuant to a court order, applicable law, or in connection with legal or administrative proceedings, it will promptly notify RBA, unless such notification shall be prohibited by applicable law or legal process, so that RBA may, at its election and sole expense, seek a protective order or other appropriate remedy. If such protective or other order or remedy is not obtained, Licensee agrees to furnish only that portion of the Confidential Information that it is legally required to disclose on the advice of counsel.

[The rest of this page intentionally left blank.]

SCHEDULE 1

ESTIMATE OF COSTS AND EXPENSES

[To be inserted.]

SCHEDULE 2

INSURANCE GUIDELINES FOR RED BULL ARENA, INC. ("RBA")

| Licensee INSURANCE REQUIREMENTS |
| --- |

During the Term of this Agreement, Licensee (hereinafter "You/Your") shall maintain, at Licensee's sole cost and expense, the following insurance:

1. Standard Commercial General Liability Insurance for ongoing and completed operations, including products liability coverage, with limits not less than $5,000,000 per occurrence and in the aggregate.

2. Commercial Automobile Liability Insurance including coverage for all owned, non-owned, hired, leased, or rented vehicles with not less than $1,000,000 Combined Single Limits for each accident.

3. Workers' Compensation coverage as required by applicable law (including US Longshore and Harbor Workers Compensation where applicable), and including Employers Liability Insurance with limits of not less than $1,000,000.

4. Professional Liability Insurance covering Your acts, errors, or omissions in connection with the performance of Your services if applicable, with minimum limits of not less than $1,000,000 per occurrence. Examples of instances where Professional Liability Insurance policies would be required might include: (i) Media Errors and Omissions Liability insurance for services related to publishing, distribution or dissemination of media; or (ii) Professional liability insurance for engineering, architectural, or accounting services.

All the insurance listed above (excepting Workers' Compensation and Professional Liability) shall be primary and non-contributory to any other insurance or self-insurance held by RBA. All policies shall name Red Bull Arena, Inc., its parent and affiliates, Hudson County, Hudson County Improvement Authority and Harrison Township, New Jersey, and each of their respective agents, officers, members, directors, employees, successors and assigns, as additional insured. The Commercial General Liability insurance and Workers' Compensation Insurance shall also include a waiver of subrogation in favor of the additional insured parties.

| THIRD PARTY INSURANCE REQUIREMENTS |
| --- |

RBA requires that each of the service providers, vendors, contractors, sub-contractors of any tier You hire in order to complete the work or services under this Agreement provide You with a certificate of insurance and all required policy endorsements evidencing coverage for the operations they will be performing on site for the development of the Event. They must meet the minimum standards as outlined below. Furthermore, to the extent that Your vendor/contractor hires a sub-contractor, these insurance requirements shall apply to those subcontractors of any tier as well. A certificate of insurance (including any required additional insured endorsements) must be secured from each party to confirm the requisite amounts of insurance and should be provided to RBA no later than 3 days prior to the first day of the Event. Any failure to obtain insurance coverage from service providers You hire will be Your sole responsibility and ultimate liability.

During the Term of this Agreement, each service provider, vendor, contractor, sub-contractor of any tier You hire shall maintain at its sole cost and expense, the following insurance:

1. Standard Commercial General Liability (CGL) Insurance for ongoing and completed operations, including products liability coverage, with limits of not less than $1,000,000 per occurrence (see below chart for additional required levels and types of insurance);

2. Commercial Auto Liability Insurance with minimum limits of not less than $1,000,000 Combined Single Limits per accident for all owned, non-owned, hired, or rented autos for any vendor involved in the transportation, delivery, loading/unloading operations; and

3. Workers' Compensation coverage as required by applicable law including Employers Liability with a minimum limit of $500,000.

| TRADE/ TYPE | COMMERCIAL GENERAL LIABILITY LIMITS | AUTO LIABILITY LIMITS | ADDITIONAL COVERAGE REQUIRED | REMARKS |
|---|---|---|---|---|
| Food & Beverage and/or Catering Services | $1,000,000 to $5,000.000 depending on capacity | $1,000,000 Combined Single Limits | If serving alcohol, *Liquor Liability Insurance coverage with minimum limits of $1,000,000 to $3,000.000 depending on capacity. | *Liquor liability is mandatory for any vendor distributing, selling, serving, or furnishing alcoholic beverages. So called "host liquor liability" is not acceptable. |
| Security Services Provider | $2,000,000 | $1,000,000 Combined Single Limits | | |
| EMS/Medical Services | $2,000,000 | $1,000,000 Combined Single Limits | EMS provider must have Medical Malpractice coverage with minimum limits of $1,000,000 | |
| Scaffolding structures including grandstand, stages, etc. | $2,000,000 to $5,000,000 | $1,000,000 Combined Single Limits | | |
| All other services & vendors* | $1,000,000 | $1,000,000 Combined Single Limits | * Notify RBA if services involve aircraft and pyrotechnics. | |

All certificates of insurance (and any additional policy forms as necessary), shall name Red Bull Arena, Inc., its parent and all affiliated and related companies, Hudson, County, Hudson County Improvement Authority and Harrison Township, New Jersey, and each of their respective agents, officers, members, directors, employees, successors and assigns, as additional insured(s) by attachment of an endorsement and evidence that all insurance listed above shall be primary and non-contributory. All policies shall also include a waiver of subrogation in favor of the additional insured parties. Certificates of insurance and required policy endorsements can be sent to ATTN: Red Bull Risk Management, 1740 Stewart Street, Santa Monica, California 90404. They may also be sent via email to insurance@us.redbull.com or via fax to (310) 460-4835.

NOTE: The above requirements is not an exhaustive list and RBA reserves the right to modify the types and amounts of coverage as deemed necessary at its sole and absolute discretion. Any deviation from above insurance requirements will need prior approval from Red Bull Risk Management.

SCHEDULE 3

SITE PLAN FOR THE EVENT

[To be provided by Licensee.]

Schedule 4

License Periods

The defined term ”License Period” shall mean individually each of the License Periods, and collectively, the First License Period, Second License Period, Third License Period, Fourth License Period, Fifth License Period, and Sixth License Period, each as defined below. Each of the Events are part of the *Sports Illustrated Stadium Concert Series*.

- June 13: Sofi Tukker and TBD
- June 14: Kidz Bop
- June 16: Justice / DJ Snake
- June 22: Kygo / Kaleo
- June 26: INK and TBD

| | |
|---|---|
| **First License Period and Event** | The term of the First License Period shall begin 6:00 a.m. Eastern on Saturday, June 13, 2026 and shall expire 5:59: a.m. Eastern Sunday, June 14, 2026.<br><br>The Event is Sofi Tukker and TBD on Saturday, June 13 from 5:00 p.m. – 11:00 p.m. Eastern. |
| **Second License Period and Events** | The term of the Second License Period shall begin 6:00 a.m. Eastern on Sunday, June 14, 2026 and shall expire 5:59 a.m. Eastern Monday, June 16, 2026.<br><br>The Event is Kidz Bop on Sunday, June 14 from 1:00pm – 4:30pm and Monday June 15 from 5:00pm-9:00pm. |
| **Third License Period and Event** | The term of the Third License Period shall begin 6:00 a.m. Eastern on Tuesday, June 16, 2026 and shall expire 5:59 a.m. Wednesday, June 17, 2026.<br><br>The Event is Justice and DJ Snake on Tuesday, June 16, 2026 from 2:00 p.m. – 10:00 p.m. Eastern. |
| **Fourth License Period and Event** | The term of the First License Period shall begin 6:00 a.m. Eastern on Monday, June 22, 2026 and shall expire 8:00 a.m. Eastern Tuesday, June 23, 2026.<br><br>The Event is Kygo and Kaleo on Monday, June 22 from 4:00 p.m. – 10:30 p.m. Eastern. |
| **Fifth License Period and Event** | The term of the First License Period shall begin 6:00 a.m. Eastern on Friday, June 26, 2026 and shall expire 5:59 a.m. Eastern Saturday, June 27, 2026.<br><br>The Event is INK and TBD on Friday, June 26 from 2:00 p.m. – 10:00 p.m. Eastern. |

SCHEDULE 5

Permanent Equipment

## STAGE



**Stage: PGP Blue Steel**
- 60'x 56'x 6' deck
- (2) 32'x 56'x 6' wing
- 60'x 40' Load bearing roof
- (4) 60' Towers for main roof
- (2) 60' PA towers
- PA/Video Bay 1 26' Wide
- PA/Video Bay 2 34' Wide on 45 angle
- 16' x 72' Ramp (Stage height to ground)

## STAGE



## STAGE




## PRODUCTION - LED



## PRODUCTION – AUDIO & LIGHTING SPECS

**Audio Specs***
MAIN SPEAKER ARRAYS
DELAY SPEAKER ARRAYS
L-Acoustics, K1 Enclosure L-Acoustics, K2 Enclosure

SUBWOOFERS
Enc, L-Acoustics, K1-SB
L-Acoustics SB28 Double 18" Sub

FRONT FILL
Enc, L-Acoustics, KUDO

CONSOLES
Spec Per Riders

*Full gear list in provided Tech Pack

**Lighting Specs***
STAGE LIGHTING FIXTURES
Elation Proteus Maximus Robe Spider Wash Fixture
Chauvet Color STRIKE M
Elation DTW 700IP Blinder - 4 Light Mole Robe
TetraLinear LED Moving Light
Clay Paky Mythos 2

DELAY TOWER LIGHTING FIXTURES
Elation Proteus Maximus Chauvet Color STRIKE M

ROBO SPOT SYSTEM
Robo Spot Base Station

## PRODUCTION – VIDEO SPECS




**Video Specs - Stage UPSTAGE WALL**
55' 1"'W X 31' 5"H. 7.9mm

IMAG SCREENS
27' 5" W X 31' 5" H 5.9mm
SL & SR vertical IMAG screens with automation to slide together to form 55' 1"'W X 31' 5"H downstage for watch party

VIDEO BAY 2 VIDEO WALLS 30' W x 16'T 7.9mm
PROCESSOR
NovaStar

## PRODUCTION – VIDEO SPECS




**Video Specs – Endzone Video***
*opposite end of field from stage

FREESTANDING LED TRAILERS IF AVAILABLE (x2)
SCREEN SIZE: 17' x 10'
RESOLUTION: 1040 x 624

5.9mm upstage wall

## POWER



**Generator Power 208V Three Phase Cam Locks**

MAIN STAGE
x3 400 amp services

DELAY TOWERS
x2 200 amp services